FILED
JAN 05 2011

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DEBORAH STRINGFELLOW,

      Plaintiff,

                                            CV 09-474-PK

                                            OPINION AND
v.                                          ORDER

BEREEDERUNGSGESELLSCHAFT H.
VOGEMANN GMBH,

      Defendant.

PAPAK, Magistrate Judge:

      Plaintiff Deborah Stringfellow filed this action against H. Vogemann GmbH, Wallem GmbH & Co. KG, Voge Janina GmbH & Co. KG, and Bereederungsgesellschaft H. Vogemann GmbH on April 28, 2009, alleging the defendants' liability for negligence under 33 U.S.C. § 905(b) in connection with an incident in which Stringfellow slipped and fell while working as a winch driver during loading operations on board a cargo ship operated and managed by defendant Bereederungsgesellschaft H. Vogemann GmbH. On November 10, 2009, Stringfellow amended her complaint to dismiss all defendants other than Bereederungsgesellschaft H. Vogemann GmbH ("Vogemann"). This court has jurisdiction over Stringfellow's action pursuant to 28 U.S.C. §

Page 1 - OPINION AND ORDER

1332(a), based on the diversity of the parties and the amount in controversy.

Now before the court is Vogemann's motion (#30) for summary judgment. I have considered the motions, oral argument on behalf of the parties, and all of the pleadings on file. For the reasons set forth below, Vogemann's motion is denied.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## FACTS

On or around May 12, 2007, Stringfellow was working as a winch driver during loading operations aboard the cargo vessel *Voge Felix* while it was docked at the Portland Bulk Terminal. At that time, Stringfellow had more than 20 years of experience as a longshore worker. Her shift began at 11:00 p.m. For purposes of Stringfellow's shift that night, her supervisor was longshore foreman Larry McClain. McClain reported to terminal superintendent Gary Patrick Thomson.

Page 2 - OPINION AND ORDER

Prior to the beginning of Stringfellow's shift, at approximately 6:00 p.m., McClain performed a general inspection of conditions aboard the *Voge Felix*, including the gangway and all access to the hatches on the shore side of the ship. McClain's inspection did not include inspection of conditions all the way around any hatches. McClain's inspection revealed no unsafe working conditions.

Over the first two hours of her shift, Stringfellow was aware of two *Voge Felix* crewmembers working near her; these crewmen were apparently present for the purpose of "deck roaming," that is, ensuring that cargo loading operations were being performed properly and that working conditions were safe.

Approximately two hours into her shift, Stringfellow needed to move to the other side of the hatch she was working with. Her path to the other side of the hatch required her to climb a two-step stairway up to a low platform bridging a deck pipe. When she placed her foot on the stairs, she stepped on a clear substance that was on and under the steps, causing her to slip, fall, and suffer injury. At the time of her injury, Stringfellow was wearing what she characterizes as "skid-proof, steel-toed" workboots, which she was apparently required to do pursuant to her employer's policy.

Stringfellow's fall was witnessed by another longshoreman, Stanley Anderson. After Stringfellow's fall, Anderson investigated the substance on the stairs and deck by rubbing the sole of his boot in it. He testifies that the substance was slick and slippery, like an oil. After identifying the substance as slippery, Anderson contacted longshore foreman McClain by radio, to report the incident and to request that McClain come to the scene. Both McClain and terminal supervisor Thomson responded to Anderson's call.

When Thomson arrived on the scene, he rubbed the sole of his boot in the slippery substance in much the same manner as had Anderson, likewise reaching the conclusion that the substance was slippery, an oily substance rather than water condensation or moisture. When McClain arrived on the scene, his first action was to ensure that Stringfellow was escorted safely off the ship. Next, he showed the slippery substance to two *Voge Felix* crewmen, and advised them that the substance was a safety hazard requiring immediate correction. The crewmembers then cleaned the slippery substance from the steps and deck, using a bucket of sand or sawdust and some rags.

Thomson testifies that subsequent inspection of the cargo loaded into the *Voge Felix* and of the cargo-loading equipment revealed no indication that the substance on the stairs could have leaked from the equipment used by the longshore workers during Stringfellow's shift. Similarly, Stringfellow testifies that the substance did not come from the equipment or cargo involved in loading operations, and that the longshore workers stevedoring activities did not cause the substance to appear.

*Voge Felix* chief mate Andige Fernando testifies that, before Stringfellow's shift began on the day of the incident, he conducted an inspection of the deck with the assistance of the ship's bosun and a crew of longshoremen. He testifies that as of the time he conducted his inspection, there was no oil on the deck of the *Voge Felix*. Fernando did not become aware of the incident in which Stringfellow was injured until long after the fact. He testifies that the ship's log contains no reference to Stringfellow's accident or to the clean-up of any slippery substance from the deck, although he further testifies that any time there is a spill on deck requiring application of absorbent material to clean it up, the incident must be entered into the log, no matter how "trivial"

Page 4 - OPINION AND ORDER

the incident. Indeed, he further testifies that any time oil is spilled on deck, a sample of the spilled material must be taken and retained by the vessel's crew.

It is undisputed that Vogemann's safety manual requires that the crews of its cargo vessels keep "[a]ll steps, walkways and stairs . . . free of obstructions and slippery materials such as oil and grease." The *Voge Felix*'s safety checklist states that the ship's master "is responsible at all times for the safe loading and unloading of the ship. . . ."

## ANALYSIS

The exclusive remedy available to a longshore worker against a vessel or its owner or operator for personal injury suffered in the course of providing stevedoring services is codified at 33 U.S.C. § 905(b). *See* 33 U.S.C. § 905(b); *see also, e.g., Wilhelm v. Associated Container Transp. (Australia), Ltd.*, 648 F.2d 1197, 1198 (9th Cir. 1981) (Section 905(b) provides exclusive remedy to longshore workers). Section 905(b) provides, in relevant part, as follows:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

33 U.S.C. § 905(b). The leading case construing the duties of a vessel or shipowner to a stevedore or longshore worker is *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156 (1981). The *Scindia* court affirmed the longstanding rule that a:

Page 5 - OPINION AND ORDER

> vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances." This duty extends at least to exercising ordinary care under the circumstances **to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. . . . The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.** . . . It is also accepted that the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

*Scindia*, 451 U.S. at 166-167 (emphasis supplied). However, the *Scindia* court held that, following certain 1972 amendments to the Longshoreman's and Harbor Workers' Compensation Act, and in particular to Section 905(b), the vessel and shipowner are under no duty "to inspect or supervise the stevedoring operation." *Id.* at 168. Instead, "[a]s a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards." *Id.* at 170. Moreover, the *Scindia* court expressly adopted the position that:

> absent contract provision, positive law, or custom to the contrary . . . the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. **The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself.**

*Id.* at 172 (emphasis supplied).

Finally, the *Scindia* court held that, in addition to the foregoing, "there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations." *Id.* at 175. The court suggested that these circumstances could arise where a decision of the stevedore:

> was so obviously improvident that [the shipowner], if it knew [or should have known] of the [improvident decision and the reasons for its improvidence], should have realized the [improvident decision] presented an unreasonable risk of harm to the longshoremen, and that in such circumstances it had a duty to intervene and [correct the problem].

*Id.* at 175-176 (footnote omitted).

The Ninth Circuit has interpreted *Scindia* as setting forth a five-aspected duty of care owed by a vessel to a longshore worker. *See Bjaranson v. Botelho Shipping Corp.*, 873 F.2d 1204, 1207 (9th Cir. 1988). The first such aspect may be described as the "turnover duty of safe condition, as it relates to the condition of the vessel before it is turned over to the stevedore." *Id.* The turnover duty of safe condition refers to the *Scindia* duty to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property" at the time cargo loading or unloading operations begin." *Id., quoting Scindia*, 451 U.S. at 167.

The second such aspect may be described as "the turnover duty to warn." *Id.* This refers to the *Scindia* duty to warn "the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably

Page 7 - OPINION AND ORDER

competent in the performance of his work." *Id.*, *quoting Scindia*, 451 U.S. at 167.

The third such aspect is the "active involvement duty." *Id.* This is the *Scindia* duty that obtains in the event the vessel "actively involves itself in the cargo operations and negligently injures a longshoreman." *Id.*, *quoting Scindia*, 451 U.S. at 167. The fourth such aspect, closely related to the third, is the "active control duty." *Id.* This is the *Scindia* duty that obtains in the event the vessel "fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Id.*, *quoting Scindia*, 451 U.S. at 167.

The fifth such aspect is the "intervention duty." *Id.* This refers to the *Scindia* duty to intervene to correct a dangerous condition the vessel or its owner knew about or should have known about that, despite being within the responsibility of the stevedore, so clearly should be corrected rather than endured that a duty to intervene arises. *See id*, *quoting Scandia*, 451 U.S. at 175-176.

By contrast, when it revisited the shipowner's duties to the longshore worker in *Howlett v. Birkdale Shipping Co.*, 512 U.S. 92 (1994), the Supreme Court referred to three, rather than five, *Scindia* duties: a "turnover duty" requiring the shipowner to ensure that the ship is in a safe condition when turned over to longshore workers, with a corollary duty to warn of unsafe conditions; a duty relating to areas of the ship that remain under the "active control" of the vessel, and a duty to intervene. *Howlett*, 512 U.S. at 98.

Here, Stringfellow's Section 905(b) claim appears to be premised primarily on the theory that Vogemann breached its turnover duty of safe condition. The Ninth Circuit expressly addressed the application of the turnover duty of safe condition in *Subingsubing v. Reardon Smith*

Page 8 - OPINION AND ORDER

*Line, Ltd.*, 682 F.2d 779 (9th Cir. 1982). The *Subingsubing* court quoted the Senate Committee Report on the 1972 Amendments to Section 905 as follows:

> So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section [905] would still permit an action against the vessel for negligence. To recover, [t]he [longshore worker] must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances.

*Subingsubing*, 682 F.2d at 781.

In *Subingsubing*, a longshore worker had been killed after tripping over a loose deadeye that had come from gear stowed by the ship's crew "without inspection" prior to loading operations. In an action by the longshoreman's estate against the shipowner, the district court granted summary judgment in favor of the shipowner on the grounds that the shipowner "owed the decedent no duty to inspect for, discover, remedy or warn of wood on the deck within the confines of cargo operations assigned to the stevedore, the employer of decedent," citing *Scindia* in support. The Ninth Circuit reversed, on the grounds that the evidentiary record before the court did not foreclose the possibilities either that "the crew acted negligently by failing to find the defect in the rope from which the 'dead-eye' was lost, or that the deadeye had "been on the deck for a period of time sufficient to make the vessel negligent for failing to remove it." *Id.* The court noted that "[s]uch questions are typically left to the jury."

As noted above, Stringfellow has offered testimonial evidence to the effect that the slippery substance that caused her fall did not appear on the stairs and deck as a result of the longshore workers' loading operations. Although this evidence is not by any means sufficient to

Page 9 - OPINION AND ORDER

establish as a matter of law Vogemann's liability for negligence under Section 905(b), it is sufficient, at a minimum, to create a question of material fact as to whether the slippery substance may have been present at the time the worksite was turned over to the stevedore. That is, although a finder of fact could reasonably elect to credit chief mate Fernando's testimony that no oil was present on deck at the time of turnover, or could reasonably conclude that the slippery substance was, for example, oil that leaked from the vessel's hydraulics at some time subsequent to the moment of turnover, I cannot on the evidentiary record now before me conclude that it would be clearly unreasonable for a finder of fact to infer from Stringfellow's and Thomson's testimony that the substance's presence was not caused by the activities of the longshore workers that the substance was more likely than not present when the worksite was turned over. Because a finder of fact could reasonably conclude from evidence in the record that a slippery oil covered the stairs at the moment of turnover, there is necessarily a question of fact as to whether Vogemann may have violated its turnover duty of safe condition to Stringfellow and her employer, causing her accident. Vogemann is therefore not entitled to summary judgment on Stringfellow's claims.

## CONCLUSION

For the reasons set forth above, defendant Vogemann's motion (#30) for summary judgment is denied.

Dated this 5th day of January, 2011.

Honorable Paul Papak
United States Magistrate Judge